747 A.2d 352

**CITY OF PHILADELPHIA and Pennsylvania Public Utility Commission, Appellees,**

v.

**CONSOLIDATED RAIL CORPORATION and National Railroad Passenger Corporation, Appellants.**

Supreme Court of Pennsylvania.

Submitted July 27, 1999.

Decided Feb. 24, 2000.

588

Dennis M. Moore, Washington, DC, for National Railroad Passenger Corp.

Laurence Z. Shiekman, Joann Hyle, Philadelphia, Stacey A. Mufson, San Francisco, CA, Larry R. Wood, Jr., Philadelphia, for Consolidated Rail Corp.

Bohdan R. Pankiw, Chief Counsel, Robert J. Longwell, Deputy Chief Counsel, Maryanne Reynolds Martin and Susan D. Colwell, Asst. Counsel, for PA Public Utility Comn.

Kenneth A. Murphy, Gaetan J. Alfano, Gerald T. Clark, Philadelphia, for City of Philadelphia.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION OF THE COURT

FLAHERTY, Chief Justice.

The United States Court of Appeals for the District of Columbia Circuit, pursuant to our recently adopted procedures for certification of questions of Pennsylvania law from the federal courts, see 204 Pa.Code § 29.451, petitioned for certification of the following question: Upon completion in 1929 of the re-building of the 41st Street bridge in the City of Philadelphia, was the bridge owned by the City or the Pennsylvania Railroad Company (PRR)? We granted certification on the basis that the answer to this question would provide guidance in determining bridge ownership throughout the Commonwealth.

The appellants, Consolidated Rail Corporation (Conrail) and National Railroad Passenger Corporation (Amtrak), and the appellees, the City of Philadelphia (City) and the Pennsylvania Public Utility Commission (PUC), are engaged in a dispute over ownership of the 41st Street bridge, a highway bridge over a below-grade railroad right-of-way in the City. Underlying the dispute is the question of who must pay to maintain and repair the bridge. Conrail, Amtrak, and the City all deny ownership, seeking to avoid responsibility for such costs.

The facts material to this case are not in dispute. In 1875, a steel and timber bridge was constructed to allow 41st Street to cross above the railroad right-of-way. That bridge was replaced by the present, now-deteriorated steel and concrete structure that was built in 1929. The City acknowledges that it is the owner of similar bridges that cross the same railroad

right-of-way at 40th and 42nd Streets. The supporting columns of the 41st Street bridge rest on the railroad right-of-way. Six railroad tracks lie within that right-of-way. Four of the tracks are owned by Amtrak, and two are owned by Conrail. The existing bridge was built pursuant to an ordinance of the City that required PRR to build and maintain the bridge at its own expense under supervision of the Philadelphia Department of Public Works. On behalf of PRR a document was signed accepting the terms of the ordinance on May 11, 1927. This document is known as the "ordinance agreement." PRR and its successor, the Penn Central Transportation Company (Penn Central), complied with the ordinance agreement until a financial crisis befell the rail industry in the northeastern section of the United States. In the early 1970s, railroads in the northeast were rapidly failing. By 1971, Penn Central had filed for bankruptcy. Congress responded by enacting the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 701 et seq., designed to allow railroads to reorganize and become part of the financially viable operations of Conrail and Amtrak. Penn Central reorganized accordingly.

In 1994, due to its deterioration, the 41st Street bridge was closed to vehicular traffic. The PUC, in its role as a regulator of rail-highway crossings, conducted an investigation to determine who was responsible for repair of the bridge. Subsequent action by the PUC, which was then reviewed by Commonwealth Court, resulted in the case being remanded to the PUC for apportionment of the costs of repair between the City, Conrail, and Amtrak. See *City of Philadelphia v. Pennsylvania Public Utility Comm'n*, 676 A.2d 1298 (Pa. Cmwlth.1996),* appeal denied, 546 Pa. 657, 684 A.2d 558 (1996), cert. denied, 520 U.S. 1155, 117 S.Ct. 1334, 137 L.Ed.2d 494 (1997).

In 1996, the City initiated the present action in the United States District Court for the District of Columbia, which

---

* This decision, in which the question of ownership was not a litigated issue, contains dictum indicating Commonwealth Court's belief that Amtrak owns the bridge, 676 A.2d at 1308 n. 18.

functioned as a special court in accordance with the Regional Rail Reorganization Act of 1973, 45 U.S.C. § 719. The City sought a declaration that responsibility for maintenance of the bridge had been transferred to Conrail and Amtrak when the latter entities accepted the transfer of Penn Central's property. The court granted summary judgment in favor of the City, thus holding Conrail and Amtrak responsible for all of the costs of maintenance and repair. The costs were apportioned, placing two-thirds on Amtrak and one-third on Conrail, based on the number of rail lines that each owned under the bridge.

■ Review of that decision ensued in the United States Court of Appeals for the District of Columbia Circuit, and in the course thereof the request for certification of the question of ownership arose. We are asked to decide whether, under Pennsylvania law, PRR owned the bridge upon completion of its construction in 1929. If it did not, then ownership of the bridge did not pass when the properties of PRR's successor Penn Central were transferred to Conrail and Amtrak under provisions of the Regional Rail Reorganization Act of 1973, supra. The latter parties would not, then, bear ownership of the bridge.

The City concedes that, as a general matter, where a railroad company has constructed at its own expense a bridge over its tracks at a street crossing, and the bridge is to constitute part of a public highway and be maintained by the municipality, title to the bridge rests in the municipality. Indeed, such has long been recognized as the law in Pennsylvania. For instance, in *Pennsylvania R.R. v. Greensburg, J. & P. Street Ry.*, 176 Pa. 559, 575, 35 A. 122, 129 (1896), we stated:

> *The Pennsylvania Railroad Company, complainant and appellant, has failed to make out title to the bridge in question over its right of way. Though constructed and paid for by it the contract with the borough of Greensburg shows that it was so constructed as a part of the public highway, Pennsylvania avenue, and to be maintained as such by the borough.* The only open point in the contract

was the alternative to the borough that it should in consideration of such erection cause the grade crossing over the railroad at Harrison avenue to be vacated, or failing to do so, should pay the railroad the cost of the bridge. To which alternative the borough is liable does not concern this litigation. In either case the *bridge became part of Pennsylvania avenue and the title is in the borough.*

(Emphasis added). See also *North Pa. R.R. v. Inland Traction Co.*, 205 Pa. 579, 587–89, 55 A. 774, 775–76 (1903) (railroad lacked standing to object to proposed use by streetcars of a highway bridge that it constructed over its right-of-way, inasmuch as the bridge became part of the public highway, and the railroad thus had no property interest that would be affected).

It has long been established that a bridge carrying a public street is deemed to be a part of the street, and, as such, it is owned by the entity that owns the street. *Heinlein v. Allegheny County*, 374 Pa. 496, 499, 98 A.2d 36, 38 (1953) ("The rule at common law that a bridge is a part of the highway traversing it was long ago declared to be the law of this State."); *Schlosser v. Manor Township*, 293 Pa. 315, 318, 142 A. 322, 322 (1928) (A bridge is necessarily integral to the highway crossing it, and, thus, it is part of the highway.). *Beaver County v. Beaver Valley Traction Co.*, 229 Pa. 565, 569, 79 A. 161, 162 (1911); *Beaver County v. Central District & Printing Telegraph Co.*, 219 Pa. 340, 343, 68 A. 846, 847 (1908) ("In Pennsylvania bridges are treated as part of the highway, which is carried and supported by them. . . . [T]he county owns the bridge, and maintains it for the comfort and convenience of the traveling public.").

It is undisputed that the City owns the public street that is supported by the 41st Street bridge. Hence, upon completion in 1929 of the reconstruction of that bridge, the bridge became part of the City's street.

 The City contends, however, that its ownership is negated by the fact that the ordinance agreement provides

that maintenance of the bridge will be performed by PRR. We do not agree. In pertinent part, the agreement provides:

First: That the said bridge on line of Forty-first Street in the City of Philadelphia ... to be constructed by the party of the second part [PRR] as provided for in the above mentioned ordinance, shall be constructed by the party of the second part at its own cost and expense and without cost or expense to the party of the first part [City].

Second: That the said bridge and the appurtenant work thereto shall at all times hereafter forever be maintained by the party of the second part at its sole cost and expense and without cost or expense to the party of the first part, and that such maintenance shall be under and subject to the supervision and direction of the Department of Public Works of the City of Philadelphia.

The agreement plainly specifies that the City's Department of Public Works shall supervise and direct maintenance operations, inasmuch as the City has an obvious interest in seeing that the bridge is maintained. PRR incurred a clear contractual duty to perform the maintenance and bear the associated costs. Nevertheless, the agreement is completely silent as to ownership of the bridge. There is no language that could be construed as shifting title from the City to PRR. The agreement to maintain the bridge created contractual obligations for PRR, not ownership. The normal principle that the bridge is owned by the City, as owner of the street that the bridge supports, therefore governs.

Accordingly, having answered the question certified for review, we refer this matter back to the United States Court of Appeals for the District of Columbia Circuit.

Justice SAYLOR files a concurring opinion.

SAYLOR, Justice, concurring.

I agree with the majority's articulation of the general common law rule respecting bridge ownership, but wish to emphasize my view that the rule should apply only where there are insufficient indicia that legal title lies with a non-

governmental entity. *See generally Heinlein v. Allegheny County*, 374 Pa. 496, 500, 98 A.2d 36, 39 (1953)(*stating that* "[a]s a general proposition, *but by no means universal*, bridges are treated as portions of the highways which cross them") (quoting *Rapho & West Hempfield Townships v. Moore*, 68 Pa. 404, 406 (1871))(emphasis added). Additionally, and particularly with respect to older bridges, I would not require that the evidence of ownership necessary to overcome the common law rule equate with a written deed reflecting title. Along with the problems of proof associated with the passage of an extensive period of time, rail-highway crossings represent a limited and quite unique subset of property, and the principles by which pertinent rights and obligations are to be determined should reflect the specialized context. In particular, current conceptions of railroad bankruptcy and reorganization law (which today are likely to substantially affect the consequences following from this Court's determination) simply did not exist at the time when ownership initially vested, and thus, the technicalities of documenting ownership would appear to have been far less of an issue than the careful allocation of obligations related to upkeep necessary to maintain public safety.

Nevertheless, in the present case, confronted with motions for summary judgment filed by the railroads in the district court, the City simply was unable to adduce specific material facts sufficient to overcome the common law presumption. The common law rule therefore controls, and all legal consequences associated with ownership (and non-ownership) follow under the legislative schemes which, in their interplay, will ultimately determine the parties' liabilities in connection with the repair of the 41st Street Bridge.